# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| WAYNE BYRD, | : | |
| Plaintiff, | : | |
| v. | : | |
| CUMBERLAND COUNTY | : | Hon. Joseph H. Rodriguez |
| JOHN/JANE DOE DECISION | | |
| MAKERS 1-1O, CUMBERLAD | : | Civil Action No. 17-8064 |
| COUNTY OFFICE OF THE | | |
| SHERIFF, SHERIFIT ROBERT | : | **OPINION** |
| A. AUSTINO, CUMBERLAND | | |
| COUNTY DEPUTY SHERIFF | : | |
| TIMOTHY WOODS, | | |
| CUMBERLAND COUNTY | : | |
| OFFICE OF THE SHERIFF | | |
| EMPLOYEES, AGENTS and/or | : | |
| SERVANTS 1-10, and JOHN/ | | |
| JANE DOE SHERIFF OFFICERS | : | |
| 1-10 | | |
| Defendants. | : | |

This matter comes before the Court on Defendants' Motion for Summary Judgment [Dkt. No. 17]. The Court has considered the parties' written submissions pursuant to Fed. R. Civ. P. 78 (b). For the reasons stated below, the Court will grant Defendants' Motion for Summary Judgment [Dkt. No. 17].

## I.  Background[1]

---

[1] Defendants correctly note that Plaintiff failed to submit his Response to Defendants' Statement of Material Facts, as required under Local Rule 56.1. Defendants, therefore, argue that their asserted facts should be deemed undisputed. Rule 56.1 provides that "[t]he opponent of summary judgment shall furnish, with its opposition papers, a responsive statement of material facts, addressing each paragraph of the movant's statement, indicating agreement or disagreement and, if not agreed, stating each material fact in dispute and citing to the affidavits and other documents submitted in connection with the motion; any material fact not disputed shall be deemed undisputed for purposes of the summary judgment motion." L. Civ. R. 56.1. The Court, however, has found no bad faith in the lack of Plaintiff's compliance and will relax the rule. See Fox v. Bayside State Prison, No. 14-5344, 2016 WL 589673, at *3 (D.N.J. Feb. 11, 2016); Shirden v. Cordero, 509 F. Supp. 2d 461, 463 n.1 (D.N.J. 2007). Here, Plaintiff and Defendant have submitted statements of material facts, and Defendants have also submitted a

### A.  October 11, 2015, Harvest Festival Incident

This case concerns the alleged use of excessive force on, and subsequent arrest of Plaintiff, Wayne Byrd ("Plaintiff"), while he was at the Harvest Festival in Deerfield Township on October 11, 2015. On that date, Plaintiff and his family attended the public event along with the thousands of other individuals. (Def. SMF ¶¶ 8-11). Law enforcement officers were also present at the event, including Defendant Deputy Sheriff Timothy Woods ("Officer Woods"). (Id. at ¶ 1).

Not long after arriving at the festival, Plaintiff noticed a young man standing not too far from his daughter. (Pl. Dep. 27:19-25). Plaintiff had seen the young man before, "when said male and his father came by Plaintiff's home (later identified as Julio Sigurani, Jr ["JR"]., Julio Sigurani, Sr.["SR"]) seeking permission for JR to date Plaintiff's minor daughter." (Pl. SMF ¶ 4). Plaintiff did not want JR dating his young daughter. (Id. at ¶ 5). According to Plaintiff, he also would not allow JR to talk with his daughter at the festival that day. At that time, JR began following Plaintiff and threatening him. JR "started running his mouth" and "said he was gonna F [Plaintiff] up and throw [him] up against the ride." (Pl. Dep. 28:10-17, 29:1-13). Plaintiff did not want trouble, so he approached two officers nearby and expressed that he was "being followed and threated by this young man." (Def. SMF ¶ 16).

"[Officer] Woods was at the festival in uniform and on duty to provide security to the public at large." (Pl. SMF ¶ 9). Around 4:35 p.m., SR approached Officer Woods

---

reply to Plaintiff's statement. In accordance with R. 56.1, the Court will consider those facts provided which cite to the affidavits and other documents submitted in support of the motion, and will disregard any facts that that are unsupported by the record.

to express his issues with Plaintiff. (Pl. SMF. 8; Def. SMF 17). SR told Woods that he came to the festival to have a few words, after his son told him about the earlier altercation. (Woods. Dep. 24:1-16). Officer Woods advised SR that it would not be a good idea to initiate any altercation with Plaintiff and "advised SR and JR not to seek out Plaintiff and that they should instead leave the festival. Woods thereupon observed SR and JR walk towards the exit of the festival." (Id. at 21- 25:3; Pl. SMF ¶ 12).

Plaintiff testified that he proceeded to his seats with his daughter and the rest of his family. About fifteen to twenty minutes passed when SR and JR were suddenly standing right behind him, SR already had his hands up. Plaintiff also put his hands up, to defend himself. (Pl. Dep. 35:8-18). "[SR] started getting louder" about what he was going to do to the plaintiff stating, "I'm gonna F you up, I'm gonna do this." (Id. at 36:20-21). SR and JR got closer, "in a threatening manner like they [were] going to jump [Plaintiff]." (Id. at 35:19-22). Plaintiff testified that he did not advance towards SR at any time or get closer to him. (Pl. Dep. 40: 9-18). Plaintiff saw two sheriff's officers breaking the crowd that had formed around them and when he looked back, he saw SR take off running. (Id. at 37:13-25). The son, JR, was still standing there. Plaintiff recalls that when Officer Woods and Sheriff Officer Amariel Perez ("Officer Perez") approached him, Woods stated, "take him down!" (Id. at 41:22-24).

The two officers were then on top of Plaintiff:

> [They were] choking me from the back, neck, legs, pulling me. I was trying to explain to them the whole time. I said hold up, let me say something. I couldn't say nothing the whole time until finally I got struck in the back with a blackjack ramming it through my ribs. I tried to explain to him, and it looked like they didn't want to hear anything.

(Id. at 43:11-18). Plaintiff stated he was "wrestling with them telling them, look, man,

I'm not the one . . . I was spinning all around on the ground, and I still haven't got a chance to say anything because they kept telling me to shut up and get down." (Id. at 44:13-22). According to Plaintiff, he also told officers his arm "was hurting real bad." (Id. at 61:12-18).

According to Officer Woods' report, SR claimed that Plaintiff had hit his son JR, but Officer Woods never saw Plaintiff strike anyone. (Woods Dep. 28:21-29:2). The report provides that Plaintiff appeared to be advancing towards JR as the officers approached, and at that time, Officer Perez "escorted Byrd to the ground and attempted to restrain him from attacking anyone." (Id. at 28:12-21). His report further states that Plaintiff "was resisting officer control by not releasing his left arm from under his chest . . . h[e] was loudly yelling at Byrd to stop resisting." (Id. at 31:11-21). Woods testified that he did not use this baton on Plaintiff, rather he threatened to use it. (Woods Dep. 99:4-20). Plaintiff was not told that he was under arrest. (Pl. Dep. 43:2-19). Ultimately, Plaintiff complied and was escorted to the State Police Mobile Command vehicle. (Def. SMF. ¶ 43).

There, Plaintiff advised Officer Woods about the earlier altercation with SR and JR, handled by other officers. (Id. at ¶ 48). Officer Woods interviewed SR and JR, during which JR said there was a verbal altercation earlier but denied threatening the Plaintiff. Woods, based on his training and experience, thought JR was not credible. (Woods Dep. 37) None of the parties filed charges against the other. (¶ 51). Plaintiff's handcuffs were removed and he was advised to leave the Festival and that he was not permitted to return that day. (Woods 37:1-13). SR and JR were also told the same, and left the Festival. (Woods 40:5-13).

4

### B.  Aftermath of the Incident

According to Officer Woods' initial report, no charges/complaints were filed and no further action regarding the matter was taken the day of the incident. In his supplemental report, Officer Woods also notes that Plaintiff was not processed at the festival on October 11, 2015; however, claims this was due to "limited man power." (Woods Dep. 45:4-46:4). He later attempted to arrest Plaintiff at his residence for obstruction and resisted officer control. (Def. SMF ¶ 53). Instead, Plaintiff was issued a summons, via mail. Ultimately, "[a]ll charges were resolved in the Plaintiff's favor by way of dismissal at the Municipal Court level." (Pl. SMF ¶ 41).

### C.  Plaintiff's Injuries

Plaintiff complains of injuries to his head, neck, back, shoulders, arms, hands, and legs as a result of the incident at issue. (Pl. Dep. 55:17-25). At his deposition, he also complained of injury to his mouth; specifically that he was hit in the mouth and bleeding, which he "forgot" to put in his interrogatory responses. (Id. at 56:3-12).

Plaintiff did not go to the hospital following the October 11th incident, but "[a]pproximately a week or less after the incident, Plaintiff visited his family doctor." (Id. at 56:16-20; Pl. SMF ¶ 50). Plaintiff was able to work forty hours per week as early as two weeks after the incident. (Def. ¶ 75). He did not need any further treatment for his neck, back, shoulder, hands, legs, or right arm. (Pl. Dep. 57:9-58:11; 60:14-21). Plaintiff, however, did need and receive treatment for his left arm. (Id. at 58:1-11). About three months after the incident, Plaintiff underwent surgery on his left arm for a torn tendon of the elbow joint. (Pl. Dep. at 58:4-59:5; 62:1-7).

Plaintiff was also involved in a car accident almost four months before the Festival incident. (Id. at ¶ 85). Plaintiff testified that he did tear a tendon in his left

arm as a result of that accident, for which Plaintiff went to physical therapy for six months and Jennifer Vanderbeeck, MD, arranged an MRI. ((Pl. Dep. 16:5-10, 15:16-1, 60:1-6). He also brought a personal injury lawsuit as a result of this motor vehicle accident. (Def. SMF ¶ 82). Contradicting his earlier testimony, Plaintiff also stated at his deposition that he did not have a diagnosis pertaining to his left arm prior to October 11th festival, and that he had not torn his tendon from the earlier car accident. (Id. at 59:6- 21). Plaintiff later clarified that the Harvest Festival incident made his prior elbow injury worse. (Def. SMF ¶ 103).

In addition to physical injuries, Plaintiff complained of trouble sleeping since the event at the festival. According to Plaintiff, "[a]fter explaining to Dr. Karen what had transpired at the festival, the doctor recommended Plaintiff seek therapy to talk about what happened." (Pl. SMF ¶ 56). Plaintiff was seeing a therapist before the incident at issue for a variety of reasons. (Def. ¶ 127). He was not able to "state whether he was told of a diagnosis relating to this particular incident . . ." but Plaintiff's therapist submitted a letter dated January 19, 2016 stating, "his condition has deteriorated and his symptoms escalated." (Def. Ex. X). Ms. Curry testified that Plaintiff never stated he felt traumatized. (Def. SMF ¶ 131).

### D. Procedural history

Plaintiff filed a Complaint with this Court against Cumberland County John/Jane Doe Decision Makers 1-10, Cumberland County Office of the Sheriff, Sheriff Robert A. Austino, Cumberland County Deputy Sheriff Timothy Woods, Cumberland County Office of the Sheriff Employees, Agents and/or Servants 1-10,

and John/Jane Doe Sheriff Officers 1-10 (collectively, "Defendants"),[2] seeking recovery for $1 Million. [Dkt. No. 1]. Plaintiff's Complaint alleges a total of thirty Counts for violations of 42 U.S.C. § 1983, violations of the New Jersey Civil Rights Act N.J.S.A. 10:6-2, false arrest, false imprisonment, negligence, intentional infliction of emotional distress ("IIED"), negligent infliction of emotional distress ("NIED"),[3] assault and battery, and punitive damages. [Dkt. No. 1].

Defendants jointly filed a Motion for Summary Judgment on all Counts in the Complaint. [Dkt. No.17]. That motion has been fully briefed. [Dkt. Nos. 18, 19]. Defendants submit that they are entitled to judgment as a matter of law on damages because Plaintiff cannot relate injuries to any conduct attributable to Defendants, and on liability because Defendants' are shielded by qualified immunity and, furthermore, Plaintiff fails to establish any Monell liability.

## II.   Summary Judgment Standard

"Summary judgment is proper if there is no genuine issue of material fact and if, viewing the facts in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law." Pearson v. Component Tech. Corp., 247 F.3d 471, 482 n.1 (3d Cir. 2001) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322

---

[2] The parties stipulated to the dismissal of Defendant Cumberland County, pending completion of discovery, which was completed by March 25, 2019. [Dkt. Nos. 4, 16].

[3] As correctly stated by Plaintiff himself, "negligent infliction of emotional distress requires proof of the following elements: (1) the death or serious physical injury of another caused by defendant's negligence; (2) a marital or intimate, familial relationship between plaintiff and the injured person; (3) observation of the death or injury at the scene of the accident; and (4) resulting severe emotional distress." Portee v. Jaffee, 84 N.J. 88, 101 (1980). Here, Plaintiff is the "injured person." His brief suggests that his girlfriend/fiancé, Ms. Curry, was a witness to his injury and is the individual with a claim for NIED. As she is not a party in this case, and Plaintiff cannot claim NIED based on his own injury, the NIED claim under Count XIX against all Defendants fails as a matter of law.

7

(1986)); accord Fed. R. Civ. P. 56 (a). Thus, the Court will enter summary judgment in favor of a movant who shows that it is entitled to judgment as a matter of law, and supports the showing that there is no genuine dispute as to any material fact by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56 (c)(1)(A). An issue is "genuine" if supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit. Id. In determining whether a genuine issue of material fact exists, the court must view the facts and all reasonable inferences drawn from those facts in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial. Id.; Maidenbaum v. Bally's Park Place, Inc., 870 F. Supp. 1254, 1258 (D.N.J. 1994). Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party. Andersen, 477 U.S. at 256-57. "A nonmoving party may not 'rest upon mere allegations, general denials or . . . vague statements        '" Trap Rock Indus., Inc. v. Local 825, Int'l Union of Operating Eng'rs, 982 F.2d 884, 890 (3d Cir. 1992) (quoting Quiroga v. Hasbro, Inc., 934 F.2d 497, 500 (3d Cir.

8

1991)). Indeed,

> the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

Celotex, 477 U.S. at 322. That is, the movant can support the assertion that a fact cannot be genuinely disputed by showing that "an adverse party cannot produce admissible evidence to support the [alleged dispute of] fact." Fed. R. Civ. P. 56(c)(1)(B); accord Fed. R. Civ. P. 56(c)(2).

In deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). Credibility determinations are the province of the factfinder. Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992).

### III.   Analysis

#### A.  Fictitious Defendants

Plaintiff has named a number of fictitious defendants— Cumberland County Office Of The Sheriff Employees, Agents and/or Servants 1-10; John/Jane Doe Sheriff Officers 1-10; Cumberland County John/Jane Doe Decision Makers 1-10—and alleged ten separate (10) claims against them. [Dkt. No. 1].

"[I]t is clear that, if after a reasonable period of discovery a plaintiff has not identified the fictitious defendant[s], the court may dismiss the fictitious defendant[s]." Yahaya v. Maxim Health Care Servs. Inc., No. CIV. 10-5557, 2012 WL 6203785, at *15 (D.N.J. Dec. 12, 2012) (quoting Martin v. Comunale, No. 03–CV–06793, 2006 WL 208645 (E.D. Pa. January 18, 2006)). At this stage in the case,

discovery is complete [Dkt. No. 16], however, Plaintiff has not identified any fictitious

Defendants named in the Complaint. Therefore, the Court will dismiss all fictitious

defendants and related claims. See Blakeslee v. Clinton Cty., 336 F. App'x 248, 250

(3d Cir. 2009) ("If reasonable discovery does not unveil the proper identities . . . the

John Doe defendants must be dismissed.").

### B.  Plaintiff's Constitutional Claims under 42 U.S.C. § 1983 and the New Jersey Civil Rights Act

#### 1.  Defendant Sheriff Officer Woods

Plaintiff's Federal claims are governed by Title 42 U.S.C. § 1983, which provide

a civil remedy against any person who, under color of state law, deprives another of

rights protected by the United States Constitution. See Collins v. City of Harker

Heights, 503 U.S. 115, 120 (1992). Plaintiff's State Constitutional claims are governed

by the New Jersey Civil Rights Act ("NJCRA"), which "was modeled after 42 U.S.C. §

1983, and creates a private cause of action for violations of civil rights secured under

the New Jersey Constitutions." Trafton v. City of Woodbury, 799 F. Supp. 2d 417, 443

(D.N.J. 2011) (collecting cases). Under 42 U.S.C. § 1983:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

See 42 U.S.C. § 1983.

As the above language makes clear, Section 1983 is a remedial statute designed to

redress deprivations of rights secured by the Constitution and its subordinate federal

laws. See Baker v. McCollan, 443 U.S. 137, 145 n.3 (1979). By its own words, therefore,

Section 1983 "does not . . . create substantive rights." Kaucher v. County of Bucks, 455

F.3d 418, 423 (3d Cir. 2006) (citing Baker, 443 U.S. at 145, n.3).

To state a cognizable claim under Section 1983, a plaintiff must allege a

"deprivation of a constitutional right and that the constitutional deprivation was caused

by a person acting under the color of state law." Phillips v. County of Allegheny, 515 F.3d

224, 235 (3d Cir. 2008) (citing Kneipp v. Tedder, 95 F.3d 1199, 1204 (3d Cir. 1996)).

Thus, a plaintiff must demonstrate two essential elements to maintain a claim under §

1983: (1) that the plaintiff was deprived of a "right or privileges secured by the

Constitution or the laws of the United States" and (2) that plaintiff was deprived of his

rights by a person acting under the color of state law. Williams v. Borough of West

Chester, Pa., 891 F.2d 458, 464 (3d Cir. 1989). A similar analysis may be made

regarding any claim under the NJCRA. See Armstrong v. Sherman, No. 09 CV 716, 2010

WL 2483911, *5 (D.N.J. Jun.4, 2010) ("[T]he language of the New Jersey Civil Rights

Act, like the language of 42 U.S.C. § 1983, appears to grant a cause of action only to

those persons whose rights have been personally violated."); Trafton, 799 F. Supp. 2d at

443 ("This district has repeatedly interpreted NJCRA analogously to § 1983.").

The doctrine of qualified immunity provides that "government officials

performing discretionary functions . . . are shielded from liability for civil damages

insofar as their conduct does not violate clearly established statutory or constitutional

rights of which a reasonable person should have known." Harlow v. Fitzgerald, 457

U.S. 800, 818 (1982). Thus, government officials are immune from suit in their

individual capacities unless, "taken in the light most favorable to the party asserting

the injury, . . . the facts alleged show the officer's conduct violated a constitutional

right" and "the right was clearly established" at the time of the objectionable conduct.

Saucier v. Katz, 533 U.S. 194, 201 (2001). Courts may exercise discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand. Pearson v. Callahan, 555 U.S. 223, 236 (2009).

This doctrine "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably" and it "applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." Id. (internal quotation omitted). Properly applied, qualified immunity "protects 'all but the plainly incompetent or those who knowingly violate the law.'" Ashcroft v. al-Kidd, 131 S. Ct. 2074, 2085 (2011) (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)).

Here, Plaintiff alleges Officer Woods violated his state and federal constitutional rights in using excessive force and falsely arresting and imprisoning him. Defendants submit that they are entitled to qualified immunity on each of Plaintiff's constitutional claims because Woods acted as a reasonably prudent officer in determining that there was probable cause Plaintiff was committing an offense at the time of the incident and because Plaintiff cannot prove Sheriff's Officers used excessive force. [Dkt. No. 17-2 at p. 12-13].

In opposition, Plaintiff submits that Defendants failed to act reasonably, and are not entitled to qualified immunity because "[n]o evidence has been provided to show why Plaintiff was summarily taken to the ground and roughed up by Defendants," and that "Woods was incentivized to adjust his reporting to retroactively

find a reason to justify the excessive use of force which caused the injuries to Plaintiff and the false arrest that followed." [Dkt. No. 18 at p. 12-13].

    a.  <u>False Arrest & Imprisonment</u>

"[T]he constitutionality of arrests by state officials is governed by the Fourth Amendment . . ." <u>Berg v. Cty. Of Allegheny</u>, 219 F.3d 261, 268-69 (3d. Cir. 2000). In order to prove a claim of false arrest, the plaintiff must show that the police lacked probable cause for the arrest. <u>See</u> <u>Groman v. Township of Manalapan</u>, 47 F.3d 628, 634 (3d Cir. 1995). "[P]robable cause to arrest exists when the facts and circumstances within the arresting officer's knowledge are sufficient in themselves to warrant a reasonable person to believe that an offense has been or is being committed by the person to be arrested." <u>Orsatti v. New Jersey State Police</u>, 71 F.3d 480, 483 (3d Cir. 1995). The question of whether probable cause existed is often a question for the jury. <u>See</u> <u>Groman</u>, 47 F.3d at 635. A police officer can defend a § 1983 claim by establishing: (1) that he or she acted with probable cause; or, (2) if probable cause did not exist, that a reasonable police officer could have believed it existed. <u>Kirk v. City of Newark, 536 A.2d 229, 234 (N.J. 1988)</u> (citing <u>Anderson, 483 U.S. at 663-64</u>).

The Fourth Amendment also prohibits seizures in the absence of probable cause. <u>Orsatti</u>, 71 F.3d at 482. Under the Fourth Amendment, a person is seized "only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." <u>Michigan v. Chesternut,</u> 486 U.S. 567, 574 (1988) (quoting <u>United States v. Mendenhall</u>, 446 U.S. 544, 554 (1980)). Seizure occurs only when a person is detained by "means intentionally applied" to terminate his freedom of movement by means of physical force or by show of authority. <u>Brower v. County of Inyo</u>, 489 U.S. 593, 597–98 (1989).

"In cases involving claims for unlawful arrest, false imprisonment and malicious prosecution, the qualified immunity analysis turns on whether the police officers reasonably but mistakenly concluded that probable cause existed to arrest, detain and initiate the criminal prosecution." Palma v. Atl. Cty., 53 F. Supp. 2d 743, 769 (D.N.J. 1999). Here, Plaintiff was handcuffed and detained at the Police Mobile Command at the Harvest Festival. Plaintiff argues that because "[n]o arrest of Plaintiff took place at the festival after the incident, nor was he told any charges would result from the incident," that there is a lack of evidence establishing probable cause. [Dkt. No. 18, p. 17]. According to the record, Plaintiff was not arrested after the Festival, rather he was issued a summons. To that end, Woods testified that there was a lack of manpower to effectuate the arrest at the festival for a minor offense. (See Summons, attached to Def. Ex. C). The summons was issued for Obstructing Administration of Law under 2c:29-1A and "Resisting Officer Control" in violation of 2C:29:2A(1). Defendants argue that at the time Plaintiff was detained and arrested Officer Woods had probable cause Plaintiff committed an offense in his presence, and therefore, he is entitled to qualified immunity. [Dkt. No. 17-2].

Under New Jersey law, "to arrest a plaintiff for obstruction, a law enforcement officer must possess probable cause that a suspect obstructed a public servant's lawful duties by [ ] physical interference or obstacle. . . ." Trafton v. City of Woodbury, 799 F. Supp.2d 417, 437 (D.N.J. 2011). According Officer Woods, Plaintiff obstructed the administration of law when he attempted "to prevent a uniformed sheriff's officer from peacefully investigating a civil disturbance." [Attached to Def. Ex. C.]. In particular, Defendants stress that a fair reading of Officer Woods' deposition testimony "demonstrates that at the Harvest Festival[,] Plaintiff—while engaged in an altercation

with one or more of the Siguranis—was attempting to get past Sheriff's Officer Amariel Perez in an effort to engage them." [Dkt. No. 17-2, p. 16]. Officer Woods argues that Plaintiff's actions at the Festival constituted disorderly conduct and/or obstruction.

The Court, however, must examine the facts in a light most favorable to Plaintiff at this stage of the case. Doing so, the Court must look to Plaintiff's deposition testimony, which provides that he did not make any movements toward either Sigurani. In fact, he testified that he saw Sheriff's Officers approaching and "just waited for the [officers] to come." (Pl. Dep. 40:5-8). There is no other evidence in the record that shows Plaintiff was obstructing administration under New Jersey law. At this time, therefore, the Court cannot say that probable cause existed to arrest Plaintiff for such an offence. But "[p]robable cause need only exist as to any offense that could be charged under the circumstances" Barna v. City of Perth Amboy, 42 F.3d 809, 819 (3d Cir. 1994) (citing Edwards v. City of Philadelphia, 860 F.2d 568, 575–76 (3d Cir. 1988)). While the Court must acknowledge that "the resisting arrest charge could not have provided probable cause for the arrest ab initio," the facts and circumstances within Officer Woods' knowledge are sufficient in themselves to warrant a reasonable person to believe that an offense—disorderly conduct—was being committed. See, Groman, 47 F.3d at 635.

Pursuant to N.J. Stat. Ann. 2C:33-2(a)(1), "[a] person is guilty of a petty disorderly persons offense, if with purpose to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof he . . . [e]ngages in fighting or threatening, or in violent or tumultuous behavior . . ." The undisputed record provides that "Woods never witness[ed] Plaintiff physically strike anyone, nor place his hands on anyone," nor did he observe Plaintiff yelling or cursing. (Pl. SMF ¶¶ 18, 27). However, Officer Woods

witnessed Plaintiff involved in a verbal altercation with the Siguranis. It is also undisputed that this altercation took place at a large public event, resulting in a crowd of people gathering around all three individuals. "The crowd had got so large . . they was making so much noise, that's when [plaintiff] had looked" and saw Officers approaching the situation. (Pl. Dep. 40:21-25). Officer Woods, who knew of an earlier altercation between Plaintiff and JR, was further told that Plaintiff had hit the minor male. (Woods Dep. 24:2-25:15; 28:12-22). According to Plaintiff the son was still "in his face" at that time, and then he pointed to the guy running.

"Probable cause does not require that the prosecution have sufficient evidence to prove guilt beyond a reasonable doubt. Rather, probable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." (internal quotations and citations omitted)). The facts and circumstances presented in this case were sufficient "to warrant a prudent man in believing that [plaintiff] had committed or was committing an offense." Beck v. Ohio, 379 U.S. 89, 91 (1964). More specifically, that plaintiff was engaged in tumultuous behavior. "Tumult is defined as "disorderly agitation or milling about of a crowd [] uproar and confusion of voices: COMMOTION." Maultsby v. RIH Acquisitions NJ, LLC, No. CIV.A. 09-4376, 2011 WL 6779556, at *10 (D.N.J. Dec. 27, 2011).

Furthermore, even if Officer Woods lacked probable cause to arrest and detain Plaintiff, he is entitled to qualified immunity because he "reasonably but mistakenly conclude[d] that probable cause [wa]s present." D.C. v. Wesby, 138 S. Ct. 577, 591 (2018). Therefore, Defendant Officer Woods is entitled to summary judgment on

Plaintiff's claims for false arrest and false imprisonment.[4]

    b.  <u>Excessive force</u>

Plaintiff alleges that Officer Woods' violated his state and federal constitutional rights in using excessive force. (Count IV). A Fourth Amendment excessive force claim calls for an evaluation of whether police officers' actions are objectively reasonable in light of the facts and circumstances confronting him. <u>Graham v. Conner</u>, 490 U.S. 386, 397 (1989). While the question of reasonableness is objective, the court may consider the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether the suspect is actively resisting arrest or attempting to evade arrest by flight. <u>Id.</u> In addition, the following factors are also relevant:

> the possibility that the persons subject to the police action are violent or dangerous, the duration of the action, whether the action takes place in the context of effecting an arrest, the possibility that the suspect may be armed, and the number of persons with whom the police officers must contend at one time.

<u>Kopec v. Tate</u>, 361 F.3d 772, 777 (3d Cir. 2004).

In a claim for excessive force, "the central question is 'whether force was applied in a good faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'" <u>Brooks v. Kyler</u>, 204 F.3d 102, 106 (3d Cir. 2000) (quoting <u>Hudson v. McMillian</u>, 503 U.S. 1, 7 (1992)). Furthermore, appropriate

---

[4] Plaintiff also brings common law claims for False Arrest and False Imprisonment under the New Jersey Tort Claims Act. The act does not extend immunity to public employees for such claims. "New Jersey courts treat false arrest and false imprisonment as the same tort." <u>Ramirez v. U.S.</u>, 998 F. Supp. 425, 434 (D.N.J. 1998) (citing <u>Price v. Phillips</u>, 218 A.2d 167 (N.J. Super. Ct. App. Div. 1966)). "False arrest or false imprisonment is the constraint of the person without legal justification." <u>Fleming v. United Parcel Serv.</u>, 155, 604 A.2d 657 (N.J. Law Div. 1992). Because the Court has found that probable cause existed to arrest the plaintiff, his common law claims for false arrest and imprisonment also fail. The Court will grant summary judgment on these claims in favor of Defendants.

attention should be given "to the circumstances of the police action, which are often 'tense, uncertain, and rapidly evolving.'" <u>Groman,</u> 47 F.3d at 634 (quoting <u>Graham</u>, 490 U.S. at 396). <u>See</u> <u>also</u> <u>Graham</u>, 490 U.S. at 396-97 (analyzing reasonableness of use of force "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight").

At step one, on the very limited record before the Court, taking all facts in a light most favorable to the Plaintiff, the Court finds genuine factual disputes as to whether Woods' conduct violated a constitutional right.

Here, Plaintiff's papers do not clearly articulate the exact conduct he claims violated his rights.[5] At his deposition, Plaintiff testified officers were: "choking me from the back, neck, legs, pulling me." (<u>Id.</u> at 43:11-18). He further testified that Woods "grabbed [him] by the neck the other officers grabbed [his] foot, and [he] was wiggling to get away." (<u>Id.</u> at 47:21-25). Plaintiff testified that while on the ground, he was able to feel a baton "rammed in [his] back in between [his] ribs to the point where you have to drop," without physically being hit with it. (Pl. Dep. 43:11-18; 45). He told the officers his arm was "hurting real bad," and asked the Officers to remove his handcuffs. (<u>Id.</u> at 61:12-16). Defendants argue that Officer Woods acted reasonably and that Plaintiff fails to show excessive force because of the lack of proven injury in this case. The Third Circuit has explicitly disagreed with the notion "that the absence of physical injury necessarily signifies that the force has not been excessive, although the fact that the physical force applied was of such an extent as to

---

[5] Plaintiff's Complaint alleged that Officers "violently tackled the Plaintiff to the ground, struck him with a foreign object believed to be a "blackjack" and violently pulled his arms behind his back causing injuries to the Plaintiff's head, neck, back, shoulders, arms, hands and legs." [Dkt. No. 1 ¶ 17].

lead to injury is indeed a relevant factor to be considered as part of the totality." Sharrar v. Felsing, 128 F.3d 810, 822 (3d Cir. 1997).

The Court proceeds to the circumstances that Officer Woods confronted on the day of the incident. The record, here, provides that Plaintiff attended the Harvest Festival with his family on October 11, 2015, a large public event in which Officer Woods was working. Officer Woods testified as to "limited manpower of officers assigned to the event security that day." (Woods Dep. 45:4-10). He knew that two individuals, JR and his father, SR, were in attendance to find Plaintiff to have a few words with him. (Woods Dep. at 24).

It is undisputed that, Plaintiff and the Siguranis engaged in a verbal altercation. Officer Woods and Officer Perez noticed the altercation and the large crowd that formed around the individuals. The whole concert had come around all three individuals "in a doughnut," forming "a big crowd around [them]." (Pl. Dep. 36:21-25). To Officer Woods, Plaintiff and both SR and JR appeared agitated towards each other. (Woods Dep. at 44:19-23). He and two fellow officer approached Plaintiff and the other two individuals, pushing through the crowd. (Pl. Dep. at 27). When the Officers made it through the crowd, JR "was still right there in [Plaintiff's] face." But he saw SR run at the sight of the Sheriff's Officer. (Id. at 37:13-25; 39:3-9). Officer Woods testified that he made contact with SR, who claimed that Plaintiff had hit his son, JR. (Id. at 28). At the same time, Officer Perez made contact with Plaintiff.

Whether Plaintiff was trying to engage individuals in the Officers' presence and the amount of force used to subdue Plaintiff at the time of this contact, however, are highly disputed issues of fact. According to Woods, Plaintiff "appeared to be advancing towards [JR]." (Id. at 28:7-20). But accepting Plaintiff's version of the

facts, he did not try to get closer to or advance towards JR or SR. (Pl. Dep. 40: 9-18). According to him, Officer Woods directed Officer Perez to "take him down." Plaintiff was "trying to point at the guy that was over here . . . him and his son that was threatening me is taking off running this way." (Id. at 38:1-6). Then he testifies, the "next five minutes I'm up in the air fighting for my life." (Id.).

Officer Woods, however, testified that it was Officer Perez alone who took Plaintiff to the ground, though he did not recall exactly how he did so. He then assisted Officer Perez in restraining and handcuffing Plaintiff. (Woods Dep. 30:8:24). Officer Woods' report indicates the Plaintiff was resisting officer control by not releasing his left arm from under his chest. He yelled to stop resisting, and only threatened to use the baton strike to gain Plaintiff's compliance. (Woods Dep. 31). Once Plaintiff complied, they applied handcuffs, assisted him to his feet, and took him to the mobile command for further orders. (Id. at 32).

The record provided to the Court is limited to the contrasting testimony between Plaintiff and Defendant Woods outlined above. There is no other evidence before the Court that supports one account of the facts over the other. In fact, the only other evidence provided, aside from medical records, is the testimony of Ms. Curry, Plaintiff's fiancé/girlfriend, who gives a third version of events. She observed "two officers taking [Plaintiff] to the ground" and described that "they was on his— like back part of him, and they took his arms behind. They was trying to put his arms behind his back, and then somehow got him to the ground." (Curry Dep. 29:6-0). When asked to further describe how the officers took Plaintiff to the ground, she stated "I know they had his arms, and they were trying to pin them behind his back and that's all I recall." (Id. at 31:11-16). Ms. Curry further explained that after getting

to the ground, they had a baton in his back, and "like stuck it into [Plaintiff's] back." (Id. at 36:8-20).

Accepting Plaintiff's version of events, as the Court must, the amount of force used to restrain Plaintiff may have been unreasonable. First, the severity of the crimes at issue, Resisting Arrest and Obstruction—ensuing from a verbal altercation—were minimal. See Groman v. Twp. of Manalapan, 47 F.3d 628, 634 (3d Cir. 1995). Additionally, the immediate threat to the safety of the officers or others remains unclear. While Officer Woods' report indicated restraining and handcuffing Plaintiff "not only for his safety but also for the safety of all parties, officers included," he could not expand on why there was such a threat. (Woods Dep. 30:8:24). There is also no evidence that Plaintiff potentially possessed a weapon or was otherwise dangerous or violent. At that time of Woods' conduct, there was no physical altercation. (Id. at 26). Woods never witnessed Plaintiff "physically strike anyone." (Id. at 28:23-24). And there is no dispute that Woods did not see Plaintiff strike Officer Perez. (Id. at 29:10-12).

Although Plaintiff's own testimony indicates, at least some, resistance to the Officers' control—Plaintiff testified he was "wrestling" with the officers, "wiggling to get away," and "trying to get off the ground"—he claims he was grabbed by the neck and tackled to the ground before such resistance. (Pl. Dep. 44, 48). It is also undisputed that Plaintiff was never informed he was under arrest, he was not told to stand down, and no evidence indicates that any de-escalation tactics were employed prior to "escorting" Plaintiff to the ground. (Woods Dep. 29-30).

As Defendants' stress, Plaintiff has not provided evidence of substantial injury as a result of these events to support his testimony. Plaintiff admits he never received

21

treatment for any alleged injuries aside from his left arm—the same place he admittedly was injured months prior in an automobile accident. Notwithstanding, whether the plaintiff's version is to be believed comes down to credibility. Reyes v. Chinnici, 54 F. App'x 44, 48 (3d Cir. 2002) ("this Court [has] indicated that the district court could not discount the plaintiff's allegations of the beatings he suffered by focusing on his injuries, and concluded that only a jury could determine whether the plaintiff's allegations were credible given the apparent lack of injuries."). Therefore, "[a] jury must resolve the disputed issues of fact by determining whose story to credit." Gibson v. Mueller, No. CIV. 09-6486, 2012 WL 1079128, at *9 (D.N.J. Mar. 29, 2012).

Next, the Court proceeds to step two of the qualified immunity analysis, wherein "the plaintiff  bears the initial burden of showing that the defendant's conduct violated some clearly established statutory or constitutional right." Sherwood v. Mulvihill, 113 F.3d 396, 399 (3d Cir. 1997). More specifically, absent rare cases in which a violation is obvious, "a plaintiff must show that a right is clearly established because 'the violative nature of *particular* conduct [was] clearly established." James v. New Jersey State Police, 957 F.3d 165, 169 (3d Cir. 2020) (quoting Ziglar v. Abbasi, 137 S. Ct. 1843, 1866 (2017)). Here, Plaintiff has not cited to any case law in support of finding that the relevant conduct at issue violated a clearly established right. To be sure, Plaintiff at no time in his papers argues any action violated a clearly established right. Rather, Plaintiff asserts that his "complaint [] factually supports allegations of both Federal and State constitutional civil rights violations." [Dkt. No. 18, p 19].

Plaintiff cannot rely on his pleadings as evidence to preclude summary judgment. See Trap Rock Indus., Inc. v. Local 825, Int'l Union of Operating Eng'rs,

982 F.2d 884, 890 (3d Cir. 1992) (quoting Quiroga v. Hasbro, Inc., 934 F.2d 497, 500 (3d Cir. 1991)). Indeed, Plaintiff must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial. Id.; Maidenbaum v. Bally's Park Place, Inc., 870 F. Supp. 1254, 1258 (D.N.J. 1994). Thus, Plaintiff must point to affirmative evidence in the record that contradict those offered by Defendant. See Andersen, 477 U.S. at 256-57.[6]

The "[u]se of excessive force is an area of the law in which the result depends very much on the facts of each case, and thus police officers are entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue." Kisela v. Hughes, 138 S. Ct. 1148, 1153 (2018) (internal quotation marks omitted). Upon the Court's own inquiry, it could not derive a clearly established right from "binding Supreme Court and Third Circuit precedent or from a 'robust consensus of cases of persuasive authority in the Courts of Appeals,' " that squarely governs this case. James v. New Jersey State Police, 957 F.3d 165, 170 (3d Cir. 2020)

As of October 2015, Courts found that Officer's baton strikes on unarmed and secured individuals is unreasonable. See Colon v. City of Paterson, No. CIV. 12-1653, 2014 WL 4441503, at *3 (D.N.J. Sept. 9, 2014) (citing to the Fourth and Sixth Circuit, noting that the Third Circuit had yet to rule on the particular issue). Furthermore, it is also "unreasonable to strike a handcuffed suspect who is face down and not resisting arrest." Id. Finally, the Third Circuit has held that "a reasonable officer would know, based on the *Graham* and *Sharrar* factors, that it would be excessive to

---

[6] Plaintiff's additional argument under the eight amendment is misplaced under the facts of this case. See Hubbard v. Taylor, 399 F.3d 150, 164 (3d Cir.2005) ("[T]he Eighth Amendment's Cruel and Unusual Punishments Clause does not apply until 'after sentence and conviction.' " (quoting Graham, 490 U.S. at 392 n. 6)).

grab and choke an arrestee's throat, especially before using lesser force; to hit him on the head twice with a flashlight; and to kick him when he is already restrained and on the ground. " Green v. New Jersey State Police, 246 F. App'x 158, 163 (3d Cir. 2007). In Green, all of the force allegedly used on the plaintiff, occurred after plaintiff was handcuffed.

Plaintiff's own testimony is vague as to how, when, and what force was used. Nonetheless, Plaintiff testified that Officer woods had him around the neck, and Officer Perez had his legs. (Pl. Dep. 44:7-15). He explained: "So they had me in the air, and I was wrestling with them telling them, look, man, I'm not the one . . . they just kept, you know, like get down, get down. (Id. at 44:13-22). According to Plaintiff he "was spinning all around on the ground. (Id.) Officers "kept telling [Plaintiff] put your hands out" and flipped him onto his stomach, at which point he was trying to "get off the ground." (Id. at 48:3-13). Thus, here, even in a light most favorable to Plaintiff, it is clear that he was not subdued or handcuffed when any of the alleged force was used. Moreover, Plaintiff explicitly stated he was not physically hit/struck with the baton but instead, "it was rammed" in Plaintiff's back. No precedent discusses use of a baton in this manner, nor its use under similar circumstances.

The Court must ask whether "at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful." District of Columbia v. Wesby, 138 S. Ct. 577, 589 (2018). The purpose of this inquiry "is to acknowledge the reality that 'reasonable mistakes can be made as to the legal constraints on particular police conduct.' " Hickman v. Borough, No. CV153578, 2017 WL 1197806, at *11 (D.N.J. Mar. 31, 2017) (quoting Santini, 795 F.3d at 418). On the record before the Court, it would not be clear to

every reasonable official, considering the facts knowable to Defendant Officer Woods at the time of the conduct, that his actions were unlawful. To reiterate, at that time, Officer Woods was told the Plaintiff had hit a minor male and was confronting that person in a large crowd of people, at a highly attended public event, with limited man power. Additionally, Officer Woods' initial determination that Plaintiff was the aggressor and/or posed a threat, even if incorrect, was a reasonable mistake under these circumstances. Therefore, Defendant Officer Woods is entitled to qualified immunity, and as such, the Court will grant summary judgment in his favor on Plaintiff's constitutional claims for excessive force.

### 2.  *Municipal Defendants*

Plaintiff also brings claims against certain municipal Defendants, Cumberland County Sheriff Robert Austino[7] and the Cumberland County Office of the Sheriff ("Municipal Defendants"). The Court finds that Plaintiff fails to establish a genuine factual dispute as to the liability of Municipal Defendants regarding all alleged constitutional violations.

A municipality is not liable under 42 U.S.C. § 1983 on a *respondeat superior* theory. Monell v. Dept. Soc. Servs. of New York, 436 U.S. 658, 691 (1978). In Monell v. New York City Dept. of Social Services, the Supreme Court of the United States concluded that, "a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is

---

[7] Though not explicit in the Complaint, it appears Plaintiff filed suit against Sheriff Austino in his official capacity.

responsible under § 1983." Id. at 691–695.

Therefore, to hold Municipal Defendants, including Sheriff Austino, liable under § 1983, Plaintiff must show that the "governmental unit itself supported a violation of constitutional rights." Watson v. Abington Twp., 478 F.3d 144, 155 (3d Cir. 2007) (citing Monell, 436 U.S. at 691–695).[8] Policy is made when a decisionmaker with final authority to establish municipal policy with respect to the action issues an official proclamation, policy, or edict. Andrews v. City of Phila., 895 F.2d 1469, 1480 (3d Cir. 1990). A course of conduct or practice is considered custom when, though not authorized by law, such practices are "so permanent and well-settled as to virtually constitute law." Id. To impose municipal liability pursuant to a custom, a plaintiff must show that the municipality acted with "deliberate indifference" to its known or obvious consequences. City of Canton v. Harris, 489 U.S. 378, 388 (1989); Bd. of Cty. Comm'rs v. Brown, 520 U.S. at 397, 398 (1997). See also Berg v. Cty. of Allegheny, 219 F.3d 261, 277 (3d Cir. 2000) (this can be shown if it is obvious that a custom would lead to constitutional violations). "A showing of simple or even heightened negligence will not suffice." Brown, 520 U.S. at 407.

Similarly, where the official policy at issue "concerns a failure to train or supervise municipal employees, liability under section 1983 requires a showing that the failure amounts to 'deliberate indifference' to the rights of persons with whom those

---

[8] "Since official-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent—at least where Eleventh Amendment considerations do not control analysis—our holding today that local governments can be sued under § 1983 necessarily decides that local government officials sued in their official capacities are 'persons' under § 1983 in those cases in which, as here, a local government would be suable in its own name." Monell, 436 U.S. at 691 n.55

employees will come into contact." <u>Thomas v. Cumberland Cty.</u>, 749 F.3d 217, 222 (3d Cir. 2014) (quoting <u>Carter v. City of Phila.</u>, 181 F.3d 339, 357 (3d Cir.1999)). "'[D]eliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action.'" <u>Thomas</u>, 749 F.3d at 223 (quoting <u>Brown</u>, 520 U.S. at 410). "Additionally, 'the identified deficiency in a city's training program must be closely related to the ultimate injury;' or in other words, 'the deficiency in training [must have] actually caused' the constitutional violation." <u>Id.</u> at 222 (quoting <u>Canton</u>, 489 U.S. at 391).

Here, the Complaint alleges that Cumberland County Sheriff Robert Austino and the Cumberland County Office of the Sheriff "developed and maintained a number of deficient policies and/or customs" which caused the deprivation of Plaintiff's constitutional rights. (Counts, I, III, VI). In addition, the Complaint alleges that Sheriff Austino failed to properly train and supervise Defendant Officers. (Counts X, XI). Plaintiff, however, fails to proffer any evidence that his alleged constitutional violations were a result of a policy, custom, or failure to train. Plaintiff provides only conclusory statements as to the liability of municipal defendants, failing to identify any policy or custom from which his claim is based, or any potential deficiency. Moreover, the record in this case is devoid of any evidence that Municipal Defendants acted with deliberate indifference. Accordingly, Plaintiff fails to raise a genuine factual issue concerning Municipal Defendants' liability under <u>Monell</u>. Therefore, the Court will grant summary judgment on all federal and state constitutional claims against Municipal Defendants.

### C. State Law Claims

Plaintiff's remaining claims are brought under state law and include Assault

and Battery, against Defendant Officer Woods; Negligence, against all Defendants; and intentional infliction of emotional distress, against all Defendants.

At the outset, N.J. Stat. Ann. 59:2-10 provides that "A public entity is not liable for the acts or omissions of a public employee constituting a crime, actual fraud, actual malice, or willful misconduct." Accordingly, Plaintiff's state law claim for intentional infliction of emotional distress against Municipal Defendants fails as a matter of law. See Soto v. City of Newark, 72 F. Supp. 2d 489, 497 (D.N.J. 1999) (collecting cases) (finding public entity Defendants were not liable for intentional infliction of emotional distress pursuant to N.J. Stat. Ann. 59:2-10).

With regard to Defendant Officer Woods, the New Jersey Torts Claims act provides: "A public employee is not liable if he acts in good faith in the execution or enforcement of any law." N.J. Stat. Ann. § 59:3-3. "[T]he test is whether a public employee reasonably believed that his or her actions were lawful in light of clearly established laws. "Lascurain v. City of Newark, 349 N.J. Super. 251, 287, 793 A.2d 731, 752 (App. Div. 2002). This test under the NJTCA for good faith is analogous to the qualified immunity standard under Section 1983. Lear v. Twp. of Piscataway, 566 A.2d 557, 558–59 (N.J. App. Div. 1989); see also Richardson v. City of Newark, No. CV 16-265, 2019 WL 2315013, at *7 (D.N.J. May 31, 2019).

" 'Summary judgment is warranted and, indeed, desirable, as a matter of judicial economy' once a defendant has presented evidence that 'would exclude any genuine dispute of fact as to the application of immunity.' " Id. (quoting Leang v. Jersey City Bd. of Educ., 198 N.J. 557, 582 (2009). Here, each of Plaintiff's state law claims arise from the conduct that gave rise to his constitutional claims under the NJCRA and Section 1983. For the reasons expressed above, the Court has found that Defendant Woods did

not violate any clearly establish right. Therefore, he is entitled to good faith immunity. Additionally, "[a] public entity is not liable for an injury resulting from an act or omission of a public employee where the public employee is not liable." N.J.S.A. § 59:2-2(b). As such, Municipal Defendants are not liable for Plaintiff's remaining tort claims. Therefore, the Court will grant Defendants' summary judgment on Plaintiff's state law claims.

IV.     <u>Conclusion</u>

For the forgoing reasons, Defendants' Motion for Summary Judgment will be granted.

An appropriate Order shall issue.

Dated: June 29, 2020

<u>     Joseph H. Rodriguez     </u><br>
Hon. Joseph H. Rodriguez,<br>
UNITED STATES DISTRICT JUDGE